## In re GARDEN MANOR ASSOCIATES, a California Limited Partnership, Debtor.

## In re FAIRWOOD MANOR ASSOCIATES, a California Limited Partnership, Debtor.

### Bankruptcy Nos. 1–82–01412, 1–82–01413.

United States Bankruptcy Court, N.D. California.

Feb. 25, 1987.

Jeff Berger, Richard W. Williams, Leonard J. Martinet, Paul E. Rabin, San Francisco, Cal., for debtors.

Joseph P. Russoniello, U.S. Atty. for N.D. Cal., Judith A. Whetsinte, Chief, Civ. Div. by Patrick J. Simonelli, Sp. Asst. U.S. Atty., c/o U.S. Dept. of Housing and Urban Development, Region IX, San Francisco, Cal., for U.S.

### FINDINGS AND CONCLUSIONS IN AUGMENTATION OF ORDER ON MOTION

CONLEY S. BROWN, Bankruptcy Judge.

The United States having filed a request for Findings and Conclusions in relation to the Court's rulings of November 21, 1985 and entered November 25, 1985, the Court hereby augments its rulings by setting forth its Findings and Conclusions that led to said Orders.

The United States on behalf of the Secretary of Housing and Urban Development (HUD), has requested that this Court compel the debtors (collectively, for the sake of convenience, "Manor Partners")[1] to restore improperly diverted funds to the debtor's estates which Manor Partners paid, pre-petition and post-petition, as legal fees.

---

1. The two cases, In Re Garden Manor Associates, No. 1–82–01412, and In Re Fairwood Manor Associates, No. 1–82–01413, involve certain realty and personalty known as Garden Manor and Fairwood Manor. Additionally, the general and managing partner is the same in both cases and the motions and documentary evidence are identical except as to the amounts claimed and the particular realty/personalty.

Manor Partners are the owners of rental housing projects for the elderly in Garden Manor and Orange Grove, California and are operating the projects as debtor in possession under 11 U.S.C. § 1101.[2] HUD is the holder of a First Deed of Trust (also referred to as mortgage) on the apartments. Manor Partners are in default and owe HUD as of November 1, 1985, in excess of $2,000,000.

During the period starting in January, 1982 and ending October 15, 1982 Manor Partners paid Attorney Sherman A. Silverman, $2,659 for legal services to defend HUD foreclosure initiatives; from September 21, 1982 through October 20, 1982, Manor Partners paid the law firm of Murphy, Weir & Butler, $2,402 for similar services. On October 1, 1982, it paid Attorney Ronald L. Fenolio, $10,400, retainers for services to be incurred with these Chapter 11 Petitions.

In 1976 Manor Partners borrowed in excess of $4,000,000 from the Bankers Mortgage Company of California for the construction of these apartments. HUD insured the mortgage loans to facilitate financing of these rental housing units for the elderly or handicapped as authorized by Congress under Section 231 of the National Housing Act (NHA), as amended, (12 U.S.C. § 1715v). Section 231 was designed to assist in relieving the shortage of housing for the elderly or handicapped by providing reasonable rentals to its tenants. The general and limited partners of these projects as owner-mortgagors agreed to be bound by a HUD security instrument known as the "Regulatory Agreement"[3]

---

**2.** Under Section 1101 of the Bankruptcy Code, 11 U.S.C. § 1101, the debtor in possession is the debtor in any case "who is left in possession of his or its property and business, i.e., when no person has qualified and is serving as a trustee." 1A. Herzog & L. King, Bankruptcy Code § 1101 at 506 (1985). Section 1107 provides that these powers include the power to operate the debtor's business unless the court orders otherwise. 1A Herzog & L. King, supra at 526.

Although the term debtor in possession is not fully interchangeable with the term trustee in bankruptcy under the Bankruptcy Code, with respect to the issues before us the analysis is the same whether it is the debtor in possession or trustee in bankruptcy.

**3.** The following provisions of the Regulatory Agreement are pertinent to this case:

In consideration of the endorsement for insurance by the Secretary of the above described note ... and in order to comply with the requirements of [Section 231 of] the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements....

6. Owners shall not without the prior written approval of the Commissioner:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from 'surplus cash', except for reasonable operating expenses and necessary repairs;

* * * * * *

(d) ... subtract from any real or personal property of the project;

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except 'surplus cash' and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period....

(2) No distribution shall be made ... where there is any default under this Agreement or under the Note or Mortgage;

(3) Any distributions or any funds of the project which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds ...

(f) ... incur any liability or obligation not in connection with the project.

9. (g) All rents and other receipts of the project shall be deposited in the name of the project in a bank whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this agreement for expenses of the project or for distributions of surplus cash as permit-

that included, inter alia, a restriction on their right to disburse funds from the income of the mortgaged property. The Regulatory Agreements were incorporated into the mortgage under paragraph 3 of the mortgage. The mortgage and Regulatory Agreements were all recorded in the official records of Orange County, California.

In 1979, after Manor Partners had defaulted on these loans, HUD paid the original lender in excess of $4,000,000 from the Government insurance fund; the lender assigned its interest in the mortgage notes

and other documents to the Secretary of HUD.

After several unsuccessful attempts by Manor Partners to remedy the default under proposed workout agreements, HUD initiated foreclosures. Minutes before the scheduled sale set for 10 a.m., November 3, 1982 Manor Partners filed its Chapter 11 Petitions.

There is no dispute regarding the amount or purpose of the disbursements the United States seeks to have returned to the project operating accounts. As noted, Manor Partners paid attorney Sherman A. Silverman

ted by paragraph 6(e) above. Any owner receiving funds of the project other than by such distributions of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this agreement shall hold such funds in trust. Any owner receiving property of the project in violation of this agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.
\* \* \* \* \* \*
11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners.... If such violation is not corrected to the satisfaction of the Secretary ... the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:
(a)(i) If the Secretary holds the note—declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage.
(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;
\* \* \* \* \* \*
(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.
12. As security for the payment due under this Agreement to the reserve fund for replace-

ments, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgage property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.
13. As used in this Agreement the term:"
\* \* \* \* \* \*
(d) 'Mortgaged Property' includes all property, real, personal, or mixed covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Commissioner;
(e) 'Project' includes the mortgaged property and all its other assets of whatsoever nature or whatsoever situate, used in or owned by the business conducted on said mortgaged property, such business being the furnishing of housing and such other activities as are incidental thereto;
(f) 'Surplus Cash' means any cash remaining after:
(1) the payment of:
(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;
\* \* \* \* \* \*
(g) 'Distribution' means any withdrawal or taking of cash or other assets of the project other than for mortgage payments or for repayment of reasonable expenses incident to its operation and maintenance; \* \* \* "

$2,659.00 and the law firm of Murphy, Weir & Butler $2,402.00 for legal services to defend HUD foreclosures. It paid Ronald L. Fenolio $10,400.00 to file Chapter 11 petitions. It is undisputed that these funds were paid out of rental income in the project operating accounts. This court believes that its inquiry is limited to determining if Manor Partners should have paid these lawyers with project income.

The notes, mortgages and Regulatory Agreements, copies are attached to the United State's memorandum as Exhibit B, make up the loan documents. In addition to the Regulatory Agreements HUD entered into two year Provisional Workout Arrangements[4] (workout) with Manor Partners on June 1, 1983, in an attempt to remedy the default rather than move this Court to lift the automatic stay and exercise its right to foreclose, copies are attached to the United State's memorandum as Exhibit A.

The workouts did not modify or supersede the Regulatory Agreement. It was "provisional" and stated that under the arrangement HUD would "hold the mortgages in default" on a month to month basis. It explicitly stated that HUD would take no action on the existing monetary default "provided the owners [made the] minimum monthly payments and satisfactorily performed other requirements of the Arrangement."

Paragraph 6(b) of the Regulatory Agreement prohibits the owners of a project, without the prior written approval of the Secretary of HUD, from paying out any project income other than surplus cash, except for reasonable operating expenses and necessary repairs. Under paragraph 13(f), which defines surplus cash as cash remaining after payment of all sums and deposits due under the note and mortgage and all obligations of the project, it is impossible for the borrower to be in a surplus cash position while also in default under the note. Since Manor Partners had been in default since 1979, they have not been in a surplus cash position since that time.

Also, this Regulatory Agreement provides at paragraph 17 that Manor Partners did not assume personal liability for payments due under the note and mortgage but would remain liable for funds or property coming into their hands that they are not entitled to retain and for their own acts and deeds or acts and deeds of others that they have authorized in violation of the provisions of this agreement.

Also, paragraphs 6(e)(3) and 9(g) of the Regulatory Agreement impose a trust[5] on the owners to hold all funds for the benefit of the project other than by distributions of surplus cash.

Therefore, the general and limited partners of Manor Partners are liable for these payments out of project income for the legal fees of Sherman A. Silverman, Murphy, Weir & Butler and Ronald Fenolio unless they can be classified as "reasonable operating expenses."

---

4. At May 31, 1985 Fairwood Manor had cleared its delinquencies under the workout but during the period of the workout the project was in default and there was no surplus cash for distribution to the investor partners. The legal fees in question were paid out of the operating account prior to the expiration of the workout. If this court should require Fairwood Manor to put that money back into the project operating account, then, at the end of the semi-annual or annual fiscal period the partners can take it out as excess income pursuant to paragraph 6(e)(1) of the Regulatory Agreement provided that money was not needed for necessary repairs and maintenance. An order dismissing chapter 11 proceedings was entered on April 25, 1986.

At May 31, 1985 Garden Manor was delinquent through the principal on the note and in the Reserve for Replacement Account in the total amount of $80,481.24. At the time of filing of HUD's Motion Garden Manor cured its principal delinquency but was still delinquent on the Reserve for Replacement Account. If this court should require Garden Manor to put that money [legal fees] back into the project operating account such funds would help the project meet part of its delinquency in the Reserve account and contribute to its successful reorganization which is the ultimate goal of Chapter 11.

5. For full text of paragraph 6(e)(3) and 9(g) see provisions of Regulatory Agreement, supra, footnote 3.

The Regulatory Agreement does not define "operating expenses". But in *Thompson v. United States,* 408 F.2d 1075 (8th Cir., 1969) the Court of Appeals observed at page 1080 that:

"... it is a term which probably has no fixed, precise or inflexible meaning. Regard must be had to the context in which the term is used and to the nature of the business under consideration. In present context the Court is convinced the term must be construed with at least reasonable strictness and the concept of 'operating expenses' should be limited to expenses paid or incurred in connection with the actual operation of the [project] as a going concern...."

Quoting from Chief Judge Henley of the District Court in *United States v. Thompson,* 272 F.Supp. 774 at 787 (E.D. Ark.1967).

Judge Henley acknowledged that attorney's fees under certain circumstances may be characterized as "operating expenses" of a rental housing project.

"....  Such a project in the course of its day to day operations may require the services of counsel to collect rents, to evict tenants, or to prosecute and defend lawsuits growing out of the operation of the project ..." *United States v. Thompson,* Supra, 272 F.Supp. at 789.

In *Thompson* the Court held that legal fees paid for the original acquisition of the project, settlement of lien claims and closing the construction loans were not reasonable operating expenses.

In *United States v. Frank,* 587 F.2d 924 (8th Cir.1978), the Court of Appeals in affirming the finding of the District Court held that legal fees that Frank authorized to be paid from the project operating account to challenge HUD's termination of forbearance agreements and to stop HUD's foreclosure of the mortgages were not reasonable operating expenses of the project. The Court observed at page 927:

"The District Court properly determined that these legal services were not incidental to the operation or maintenance of the project but were related to the personal investment interests of the mortgage partnerships. The regulatory agreements authorized disbursements for 'reasonable operating expenses.' A proper construction of this provision requires distinguishing expenses incurred primarily on behalf of the personal interests of the investors from those expenses related to the everyday operation of the enterprise. See *Thompson v. United States,* 408 F.2d 1075, 1079-80. (8th Cir. 1969).

The Court in *In re Hil'Crest Apartments,* 50 B.R. 610 (Bkrtcy., N.D.Ill.1985) on facts very similar to the case at bar, examined the question of whether a debtor bound by the Regulatory Agreement could pay its bankruptcy attorneys with project income. Like Manor Partners *Hil'Crest* was a partnership whose sole asset was an apartment complex insured by HUD under the National Housing Act. *Hil'Crest* had paid out of the project operating account attorneys' fees to defend a HUD foreclosure action and paid additional attorneys' fees to file a Chapter 11 bankruptcy. Both cases involved projects that had no surplus cash available because they were in default. The effect of both Chapter 11 filings was to forestall HUD foreclosures. Like Manor Partners HUD petitioned the Court to compel the partnerships to restore those funds to the project's operating account pursuant to the terms of the Regulatory Agreement. The cases involve identical Regulatory Agreements.

The issue in *Hil'Crest* is identical to the issue that confronts the Court today.

The *Hil'Crest* Court held that the payment of attorneys fees to defend a HUD foreclosure action and to file and litigate a Chapter 11 bankruptcy can not be considered "reasonable operating expenses." The Court agreed with both the *Thompson* and *Frank* and defined operating expenses as those expenses arising from the everyday operation and maintenance of the project. Id. at 612. *Accord, Thompson v. United States,* supra, 408 F.2d at 1080 (8th Cir.1969), *United States v. Frank,* supra, 587 F.2d at 927 (8th Cir.1978); *United*

*States v. American National Bank and Trust Co.,* 573 F.Supp. 1319, 1323 (N.D.Ill. 1983); *In re EES Lambert Associates,* 43 B.R. 689, 691 (Bkrtcy., N.D.Ill.1984).

These expenses are more properly defined as partnership expenses and are personal expenses of the investors. *Hil'Crest* at 612.

Like *Hil'Crest* this Court agrees with the *Thompson* observation that operating expenses are expenses arising from the everyday operation and maintenance of the project. That term cannot be construed to include legal fees paid to Sherman A. Silverman, Murphy, Weir & Butler, and Ronald L. Fenolio, because Manor Partners paid these fees to prevent the HUD foreclosures. The retention of Ronald L. Fenolio for the filing of the Chapter 11 Petition was merely a continuation of efforts to avoid foreclosure. Like *Hil'Crest,* legal services were rendered so that Manor Partners would remain in a position to own and operate those projects. These are partnership expenses that may not be paid with project income if there is no surplus cash.

Further, this is in accord with the observation of the Court of Appeals in *United States v. Winthrop Towers,* 628 F.2d 1028, 1036 (7th Cir.1980) that the National Housing Act (NHA) was primarily intended to benefit tenants-not commercial developers. To permit the funds to be used as Manor Partners would not benefit the individuals intended. For example, under paragraph 4(b) and (c) of the Regulatory Agreement the owner agrees to get HUD's prior written approval of rent schedule and any subsequent rent increases. If the court determines that those fees are reasonable operating expenses then HUD would be obligated to allow those expenses when the owner submits his request for a rent increase. In other words, an additional allowable expense makes it easier for the owner to justify a rent increase.

This Court finds that paragraph 6(b) of the Regulatory Agreement controls Manor Partner's right to disburse funds from project income. Manor Partners may use project income to pay legal fees incurred in the day to day operation of the rental apartments like collecting rent, evicting tenants and the like.

The legal fees that Manor Partners paid to its lawyers were not necessary or incidental to the day to day operation and are not operating expenses.[6] Manor Partners is liable for the $2,659 paid Sherman A. Silverman, $2,400.00 paid Murphy, Weir & Butler and $10,400.00 paid Ronald L. Fenolio. This Court will order restoration of these amounts.

Manor Partners argue that if the Court were to grant HUD's motion it would have a dilatory effect on the ability of project owners to take advantage of the protection given by the Bankruptcy Code. It urges this Court to use its equitable powers to deny HUD's motion. The Court does not agree with Manor Partner's analysis.

By granting HUD's motion, the Court does not in any way prohibit or preclude Manor Partners from exercising their rights under the Bankruptcy Code.[7] The Court is merely recognizing and enforcing the Regulatory Agreement that is a valid security[8] agreement. *Accord In re Hil'Crest Apartments,* supra, 50 B.R. at 612 (Bkrtcy., N.D.Ill.1985).

The Regulatory Agreement was executed in conjunction with and expressly

---

6. Provisions of the Regulatory Agreement, supra, footnote 3, prohibit payment of project funds, other than surplus cash, except for reasonable operating expenses and necessary repairs.

7. *See* 11 U.S.C. § 101 et seq. and its provisions for reorganization.

8. Black's Law Dictionary, Rev. 4th ed. at 1522 states that the term security is "usually applied to an obligation, pledge, mortgage etc. given by a debtor to make sure the payment or performance of his debt, by furnishing the creditor with a resource to be used in case of failure in the principal obligation."

*See* provisions of the Regulatory Agreement supra, footnote 3, particularly paragraphs 11(a)(i)(b)(d) and 12. Also see 11 U.S.C. § 101(42) defines "Security Agreement" as agreement that creates or provides for a security interest.

incorporated into the mortgage by paragraph 3 of the mortgage. It was recorded in the official records of the County recorded and became a lien on the real property that makes up the debtor's estate. We also note the importance of the enforcement of the terms of the Regulatory Agreement. Congress authorized the Secretary of HUD to regulate [9] or restrict the mortgagor as to rents or sales, charges, capital structure, rate of return, and methods of operation, 12 U.S.C. § 1715v(c)(4). HUD regulates mortgagors through the Regulatory Agreement pursuant to statutory and regulatory authority. The language of the Regulatory Agreement is clear and precise. It is essential to the confidence of public and private lenders that its written terms be implemented and enforced by the Courts. Without such enforcement, extensive judicial doctrines might develop to frustrate its terms and impair the confidence of public and private lenders. The Regulatory Agreement is not a mere private security instrument—it was created in the public interest to meet the requirements [10] of the National Housing Act, as amended and the Regulations promulgated by the Secretary pursuant to that Act.

The Court must give great weight to the aims and objectives of the National Housing Act in interpreting the Regulatory Agreement. *Beck Park Apts. v. U.S. Department of Housing*, 695 F.2d 366 (9th Cir.1982). Also, the regulations under the National Housing Act as well as the specific terms of the Regulatory Agreement must be considered in determining the rights and obligations of the parties. *Trans-Bay Engineers and Builders, Inc. v. Hills*, 551 F.2d 370, 377–378 (D.C.Cir. 1976).

Through strict enforcement of the terms of the Regulatory Agreement and recognition of HUD's right to restrict the rights of owners to disburse funds from the income of the mortgaged property, "the federal policy to protect the treasury and to promote the security of federal investment which in turn promotes the prime purpose of the Act—to facilitate the building of homes by the use of federal credit ..." will be preserved. *United States v. Stadium Apts., Inc.*, 425 F.2d 358 (9th Cir.1970), cert. denied, 400 U.S. 926, 91 S.Ct. 187, 27 L.Ed.2d 185 (1970). If the programs for Government funding are to continue, the Government must have its investments protected. As the Court of Appeals said in *View Crest Garden Apartments, Inc. v. U.S.*, 281 F.2d 844 at 848 (9th Cir.1960) we think "good reasons appear for holding that federal policy requires affording every reasonable protection to the security of federal investment." Further, by preserving confidence in security obligations, the Courts will encourage future lending.

As noted earlier, the terms of the Regulatory Agreement are incorporated in the mortgage which has been held not to be an executory contract in the context of bankruptcy and cannot be rejected under Section 365 [11] of the Bankruptcy Code. *See Matter of North American Dealer Group, Inc.*, 16 B.R. 996 (E.D.N.Y.1982). In any event, the debtor cannot show that the Regulatory Agreement burdens the estate and that the equities balance in favor of rejection. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1194–1197, 79 L.Ed.2d 482 (1984).

In fact, upholding the terms of the Regulatory Agreement, particularly paragraph 6(b) that proscribe an owner's use of

---

**9.** *See* 24 C.F.R. 207.19(b) (rates of return) (e) (rents and charges), (f) (methods of operation).

**10.** *See* the preamble (not numbered) of the Regulatory Agreement, supra, footnote 3.

**11.** Section 365(a) of the Bankruptcy Code, 11 U.S.C. § 365, provides in full:
"(a) Except as provided in Sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."
The Bankruptcy Code does not expressly define an executory contract, but the legislative history to § 365(a) indicates that Congress intended the term to mean a contract "on which performance is due to some extent on both sides". H.R.Rep. No. 95–595, p. 347 (1977), see S.Rep. 95–989, p. 58 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303.

project funds for purposes other than for reasonable operating expenses when the mortgage is in default, is vital to a successful Chapter 11 Reorganization. Ordering Manor Partners to restore unauthorized funds to the project operating account will help make it a viable rental project by helping its owners meet outstanding mortgage obligations. Allowing the debtor in possession to unilaterally alter the Regulatory Agreement or violate it's terms at will under the guise of furthering the goals of the Bankruptcy Code, seriously undermines the goals and objectives of the National Housing Act. The Court has a duty to accommodate the policies of both federal statutes. *See N.L.R.B. v. Bildisco and Bildisco,* supra 104 S.Ct. at 1204 (1984).

The primary benefactors of a successful reorganization in this case would be the partnership investors, primarily Eugene Burger, the general and managing partner of Manor Partners. The general and limited partners of Manor Partners did not assume personal liability for payments due under the note and mortgage. It is partly because of this exemption that the Regulatory Agreement provides for restrictions on the use and disbursement of project funds. *Accord, In re Hil'Crest Apartments,* supra, 50 B.R. at 612, (Bkrtcy.N.D.Ill.1985), *Thompson v. United States,* supra, 272 F.Supp. at 787 (E.D.Ark.1967), aff'd. 408 F.2d 1075 (8th Cir.1969).

Besides, the mortgaged property, as defined by the mortgage, includes rents, profits and issues. Under the mortgage, "all rents, profits, and income from the property covered by this mortgage are hereby assigned to the mortgagee." The Regulatory Agreement contains a comparable provision at paragraph 12. Both the mortgage and the Regulatory Agreement, however, permit the mortgagor to collect and retain the rents so long as it is not in default. On default, Manor Partner's entitlement to further rents ceases and the Government's right to such receipts is perfected.[12] Under federal law, the mortgagee is entitled to all income from the project on default of the mortgagor. *United States v. Pine Hill Apartments,* 261 F.2d 667 (5th Cir.1958). HUD as assignee could exercise its right to apply all project income to discharge the mortgage loan whether or not the mortgagee or a receiver takes possession. *United States v. Dunn Garden Apartments, Inc.,* 335 F.Supp. 439 (N.D.N.Y.1971). *See also Clark Investment Co. v. United States,* 364 F.2d 7 (9th Cir.1966); *In re Ventura-Louise Properties,* 490 F.2d 1141 (9th Cir. 1974); *In re E.E.S. Lambert Associates,* supra, 43 B.R. at 691 (Bkrtcy., N.D.Ill. 1984); *In re Hil'Crest Apartments,* supra 50 B.R. at 613 (Bkrtcy., N.D.Ill.1985).

Next, the income generated from the rental projects constitute cash collateral as defined by Code 363(a)[13] that Manor Partners may not use under Code 363(c)(1) unless it is used in the ordinary course of business. Since the legal fees Manor Partners paid its lawyers were not necessary or incidental to the business of running a rental project, Manor Partners may not use that cash collateral under Code 363(c)(2)[14]

---

**12.** The mortgage at paragraph 5 provides that on default, the mortgagee shall be entitled to appointment of a receiver to collect the rents. The mortgage does not, however, condition the right to those rents on appointment of a receiver.

The Regulatory Agreement at paragraph 11(b) provides that the Secretary may collect all rents or at 11(d) he may apply to any court, State or Federal, for the appointment of a receiver to take over and operate the project. See provisions of Regulatory Agreement supra, Footnote 3.

**13.** Section 363(a) of Title 11 provides in pertinent part: "cash collateral" means cash, ... securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, ... rents, or profits of property subject to a security interest ..., whether existing before or after the commencement of a case under this title.

**14.** Section 363(c)(2) of the Code provides as follows:

(2) "The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
(A) each entity that has an interest in such cash collateral consents; or
(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

unless HUD consents or the Court authorizes such use. Eugene Burger, general partner, should have gone to the limited partners to get this money to pay their attorneys for services given to protect their personal investments—not project obligations. Instead, they chose to violate the Regulatory Agreement without getting Court approval. *Accord, In re E.E.S. Lambert Associates,* supra 43 B.R. at 692 (Bkrtcy.N.D.Ill.1984). The legal fees Manor Partners paid to its lawyers was neither a "reasonable operating expense" under the Regulatory Agreement nor was it a payment made in the ordinary course of business under Section 363(c)(1).

Clearly, the Government did not consent to the payment of those legal fees. It is just as clear that the debtor and its attorneys have not been prejudiced by the delay in the Government's motion since the attorneys have had the use of those funds.

Now Section 363(e) of the Code provides as follows:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the Court shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest. In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection.

For reasons noted earlier, Manor Partners has not sustained its burden of proof. In fact, Manor Partners exposed HUD's security to greater risk by diverting funds from the operating accounts when the projects were in default in violation of the Regulatory Agreements—that money is no longer around to strike out or bring down outstanding delinquencies in the principal and/or reserve for replacement accounts or pay out necessary maintenance and repairs as required by paragraph 7 of the Regulatory Agreement and Paragraph 10 of the mortgage. The rights of debtor in possession to withdraw funds from a bank account are identical to and no greater than the rights which that entity had as pre-petition debtor. *In re Cross Keys Motors, Inc.,* 19 B.R. 976, 6 C.B.C. 2d 746 (Bkrtcy. M.D.Pa.1982).

Then Section 506(c) of the Code provides:

> (c) "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit of the holder of such claim."

If you can only tax the secured creditor for fees that preserve and benefit the rental property like the payment of legal fees for evictions and the like then you should not tax the secured creditor for fees that do not benefit that property. The fees were paid by Manor Partners not to benefit or preserve the rental projects or to protect the government or to enhance the security but "to promote the interest and expectations of the partners." [15] The fees are expenses of individual investors and can only be paid out of personal funds. Under 506(c) attorneys' fees may be paid at the expense of a secured creditor only to the extent that the secured creditor benefited from these services. See *Sells v. Sonoma V. (In re Sonoma V.),* 24 B.R. 600, 8 C.B.C. 2d 1032 (9th Cir., B.A.P., 1982).

And Section 552(b) of the Code provides in pertinent part:

> (b) . . . if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case . . . then such security interest extends to such . . . rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement, and by applicable

---

**15.** Quoting from Chief Judge Henley who analyzed the same issue in *United States v. Thompson,* supra, 272 F.Supp. at 787 (1967).

non-bankruptcy law, except to any extent that this Court, after notice and a hearing and based on the equities of the case, orders otherwise.

Therefore, since the HUD security agreements, i.e., mortgages and/or Regulatory Agreements, extended to the rents under its absolute assignment of rents clauses before the commencement of the case, then the rents continue to be subject to the security interest after the commencement of the case.

The equities here weigh heavily in favor of the secured creditor HUD, not the debtor. In light of the undisputed defaults in the obligations of the notes, mortgages and Regulatory Agreements, the important National Housing policy considerations and the government's statutory and contractual right to restrict the owner's right to use funds from the income of mortgaged property and the applicable Bankruptcy law that support HUD's position the court is compelled to order restoration of these funds.

Manor Partners is free to retain and pay counsel to represent it in these proceedings, but it cannot do so with funds from the project operating account.

THEREFORE, IT IS HEREBY ORDERED that the Motion of the United States to compel debtors to restore improperly diverted funds to the estate is granted. Debtor, Garden Manor Associates, shall restore $8,423.00 to the operating account of Garden Manor, FHA Project No. 132–38003–PM and debtor Fairwood Manor Associates shall restore $7,038.00 to the operating account of Fairwood Manor, FHA Project No. 143–38004–PM within ten (10) days of the entry of this Order.