A99A2228. MULTIFAMILY MORTGAGE TRUST 1996-1 et al.
v. ARA ASSOCIATES-SHANGRI-LA, LTD. et al.
(530 SE2d 217)

JOHNSON, Chief Judge.

In this case, the borrower and guarantor of a federally insured mortgage loan entered into a forbearance agreement designed to stop

---

foreclosure on a security deed after the borrower defaulted on the loan payments. The forbearance agreement required that the borrower make minimum monthly payments to the lender and also pay the lender any funds the borrower had in an operating account each month in excess of $42,015 after the borrower paid operating expenses. The borrower was also responsible under the agreement for paying for and making repairs required by the guarantor. The borrower made the minimum monthly payments to the lender, but, after the borrower paid for extensive repairs and incurred other expenses, it claimed there were no excess funds with which to pay the lender. The lender declared the borrower in default and started foreclosure proceedings. Claiming there was no default, the borrower successfully moved to enjoin the foreclosure. We agree that there was no default and affirm the decision of the trial court.

In November 1980, ARA Associates-Shangri-La, Ltd. ("ARA") granted a security deed and note to Trust Company Mortgage to secure a mortgage loan for financing the purchase of Shallowford Oaks Apartments. The loan was guaranteed by the U. S. Department of Housing & Urban Development ("HUD") pursuant to Section 221 (d) (4) of the National Housing Act.

In March 1992, Altman Management Company, of which Joel Altman is managing partner, assumed management of the property. At the time Altman took over, many of the apartment units were vacant, and others were uninhabitable. ARA defaulted in its mortgage payments to Trust Company.

In 1993, the note was assigned to HUD. In November 1994, HUD and ARA entered into a provisional workout agreement, the purpose of which was to prevent foreclosure by eliminating the arrears on the note. It also required repairs to be made to the apartments during the workout period. The workout agreement became effective in December 1994 and is set to expire in November 2001.

Paragraph 3 (a) of the workout agreement provides that ARA will make minimum mortgage payments each month. Paragraph 3 (c) provides that "[a]ny funds over $42,015 . . . remaining in the operating account each month after payment of project operating expenses will be remitted in addition to the minimum monthly payment."

Paragraph 4 of the agreement provides that:

> [t]he mortgagor agrees to maintain the premises and provide management services in accordance with the Regulatory Agreement and the mortgage. In the event repairs are required which would normally fall within the reserve for replacement fund during this workout period, [ARA] agrees to make such repairs and make payment for such repairs

from [its] own resources if the property cannot generate the necessary funds.

In June 1996, HUD sold the security deed and note to Multifamily Mortgage Trust 1996-1 ("MMT"). ARA continued operating under the workout agreement, utilizing funds from the operating account to make extensive repairs and making the minimum payments required under paragraph 3 (a) of the workout agreement. However, ARA did not make the payments provided for in paragraph 3 (c).

In November 1997, MMT declared ARA in default of the workout agreement, asserting that ARA had not complied with paragraphs 3 (c) and 4 of the workout agreement and had not complied with a provision contained in a separate plan purportedly setting limits on repair costs. In January 1998, MMT transferred the security deed and note to WMFMT Real Estate, L.P. ("WMFMT"). A month later, WMFMT started foreclosure proceedings. ARA and Altman filed an action to enjoin the foreclosure. The trial court granted the injunction, holding that ARA had not defaulted on the workout agreement because the funds from the operating account were spent on repairs and because incurred expenses could properly be deducted from the account balance in determining if there were excess funds in the account. The judgment was appealed to the Supreme Court, but the Supreme Court transferred the appeal to this court for consideration.

1. MMT, the Archon Group, L.P. (an asset manager for MMT), and WMFMT (collectively "the lenders") argue that the trial court abused its discretion by refusing to apply the unambiguous terms of the provisional workout agreement. The lenders contend that: (a) the term "project operating expenses" means expenses required to keep the business running, not capital improvements like those made by ARA; (b) the plain language of paragraph 3 (c) requires ARA to have no more than $42,015 in its operating account each month and requires that any excess after ARA pays its operating expenses must be paid to the lenders; (c) paragraph 4 clearly requires ARA to pay for repairs itself if the project cannot generate enough funds to do so, meaning ARA cannot pay for repairs out of the operating account; and (d) "after payment" does not mean "after accrual," so ARA cannot deduct expenses that have accrued but have not actually been paid when calculating its operating expense account balance each month.

We agree with the trial court that the phrase "operating expenses" is ambiguous. The term has no certain meaning, and it is not defined in the agreement. Cases that have addressed the meaning of "operating expenses" in HUD regulatory agreements consistently hold that to qualify as operating expenses, expenses must primarily benefit the project rather than the owner. *Arizona Oddfellow-Rebekah Housing v. U. S. Dept. of Housing &c.*, 125 F3d 771, 774 (II)

(A) (9th Cir. 1997). Repairs made to the property here benefit the project rather than the owner.

It is also helpful to consider the context in which the term is used and the nature of the business under consideration. See *Thompson v. United States*, 408 F2d 1075, 1080 (1) (c) (8th Cir. 1969). The business here is an apartment complex insured by HUD under the National Housing Act. One of the National Housing Act's objectives is to make decent housing available for low-income people. *United States v. Beacon Terrace Mut. Homes*, 594 FSupp. 53, 57 (III) (Md. D.C. 1984). The provisional workout agreement states that ARA must make and pay for repairs. HUD inspections revealed the need for extensive repairs to improve the conditions of the apartments. For example, HUD inspected the apartments in 1994 and gave the project a rating of below average. The report required that ARA make extensive repairs to the 43-building, 204-unit complex, such as replacing wood trim and porch ceilings throughout the property; replacing entrance doors, roofs, canopies, gutters and downspouts; and repairing asphalt paving, decks, stairs, railings, and lawn areas. In light of the guarantor's objectives, the terms of the agreement, the condition of the property, and the borrower's responsibility to make repairs, the term "operating expenses" in the workout agreement reasonably includes the costs of making extensive repairs to the project.

We realize capital improvements are normally paid out of a reserve for replacement fund and that some of the repairs may, under some circumstances, be considered capital improvements. However, the provisional workout agreement provides that required repairs normally paid for with reserve funds are, during the workout period, to be paid for with funds generated by the property or with ARA's own resources. The funds in the operating account were generated by the property. ARA did not violate the workout agreement by paying for the required repairs out of the operating account.

We do not agree with the lenders that the "after payment of project operating expenses" language of the provisional workout agreement plainly prohibits ARA from considering charges incurred but not yet paid in calculating the account balance. We agree with the trial court that incurred operating expenses can reasonably come within that provision. As the court noted in *Thompson*, supra, operating expenses are those paid *or incurred* in connection with the actual operation of the project. Furthermore, contrary to the lenders' argument, management fees may under some circumstances be considered operating expenses because they are expenses incidental to and incurred in connection with the day-to-day operation of the project. See generally *In re Garden Manor Assoc.*, 70 B.R. 477, 481 (13) (Bankr. N.D. Cal. 1987).

The lenders also argue that ARA spent more on repairs than it proposed to spend in the management improvement and operating plan submitted to HUD in July 1994 ("the MIO plan"). The MIO plan is a budget designed by the borrower to show HUD the intended sources and uses of funds for a set time period. That plan, however, preceded the provisional workout agreement by about five months and was not incorporated into the workout agreement. In addition, there is some question as to whether HUD, which did not sign the plan, found it acceptable. Furthermore, the provisional workout agreement states that the written terms of the provisional workout agreement are complete in all respects (except that it refers to the note, mortgage and regulatory agreement), and a HUD expert testified that an MIO plan does not act as a ceiling. Thus, that ARA indicated in the MIO plan that it planned to spend less on repairs than it did is irrelevant to this case.

We agree with the trial court that the parties to the provisional workout agreement intended that the necessary repairs would be made from the operating account.

2. The lenders argue that even if the agreement is ambiguous, the trial court ignored the rules of contract construction. As the lenders admit, the court is to give effect to the intention of the parties. OCGA § 13-2-3. The trial court considered the intent of the parties in making the provisional workout agreement, which was to prevent foreclosure and allow ARA seven years to catch up on its payments while making necessary repairs to the property. The lenders declared a default after only three years and despite ARA's compliance with the other terms of the provisional workout agreement, including making the minimum monthly payments. The trial court did not violate the rules of construction relied upon by the lenders.

3. The lenders argue that the trial court erred in implying that the lenders waived the defaults by not declaring the defaults sooner. The trial court did not hold that there was any waiver. Instead, it discussed the lenders' and HUD's conduct in determining the parties' intent in entering into the agreement, which was a relevant consideration. See OCGA § 13-2-3; see generally *Fox v. Washburn*, 264 Ga. 617, 618 (1) (449 SE2d 513) (1994).

4. In light of the foregoing, the lenders' argument that the trial court erred in denying their motion to alter or amend the judgment and to grant their motion for injunctive relief is without merit.

*Judgment affirmed. McMurray, P. J., and Phipps, J., concur.*

DECIDED FEBRUARY 22, 2000.

*Morris, Manning & Martin, Frank W. Deborde, Robert C. Threlkeld, Beth E. Rogers*, for appellants.

*Troutman Sanders, James K. Quillian, William M. Droze, Thomas E. Reilly,* for appellees.