In the Matter of GROWERS PROPER-
TIES NO. 56 LIMITED, A Florida Lim-
ited Partnership, Growers Properties
No. 80 Limited, A Florida Limited Part-
nership, Growers Properties No. 86
Limited, A Florida Limited Partner-
ship, Growers Properties No. 89 Limit-
ed, A Florida Limited Partnership,
Debtors.

Bankruptcy Nos. 90–1782–8B1 to
90–1785–8B1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 17, 1990.

Melody D. Genson, Joy, Gause, Genson &
Moran, Sarasota, Fla., for debtors.

Mark J. Wolfson, Rudnick & Wolfe, Tam-
pa, Fla., for Glendale Federal Bank, F.S.B.

Lynne England, U.S. Trustee's Office,
Tampa, Fla.

AMENDED ORDER ON GLENDALE
FEDERAL BANK'S MOTION TO
DISMISS, MOTION FOR RELIEF
FROM AUTOMATIC STAY, AND MO-
TION TO PROHIBIT USE OF CASH
COLLATERAL

THOMAS E. BAYNES, Jr., Bankruptcy
Judge.

■■■■ THIS CAUSE came on for final
evidentiary hearing upon Glendale Federal
Bank's consolidated Motions to Dismiss,
for Relief from Automatic Stay, and to
Prohibit Use of Cash Collateral. This
Court has previously awarded adequate
protection in the form of periodic pay-
ments, inspection rights, reporting by the
Debtors, and other protection as to the use
of cash collateral. This Court has previ-
ously denied Glendale's objections to the
use of cash collateral based upon assign-
ment of rents.[1]

---

1. Glendale took the position their properly re-
corded assignment of rents from the Debtors

was absolute. Therefore, Debtors had no inter-
est in the rents. Such a position is suggested by

The Motions to Dismiss and for Relief from Automatic Stay were consolidated for hearing in that Glendale is the sole mortgagee on all properties and the Debtors' ownership, operation, and liability are the same to each property.

### SIMILAR FACTS

Each of the Debtors is a limited partnership. Prior to filing bankruptcy, they had the same general partners. After the filing of the bankruptcy all Debtors had the same new general partner. Each of the Debtors operated a single apartment complex except Growers Properties No. 80, which has two apartment complexes.

Prior to the filing of the bankruptcy, Glendale had foreclosed against each of the Debtors' properties in state court and was about to obtain a final judgment in foreclosure. At the time the foreclosure judgment was to be obtained, but prior to the filing of the bankruptcy petition, the pre-bankruptcy general partners stipulated with Glendale to allow the partners to continue to operate the property in order to effectuate a sale to a third party. Part of the stipulation was that Glendale would have a right to oversee the budgets of the Debtors and if bankruptcy was filed, the pre-bankruptcy general partners stipulated to relief from the automatic stay. One day prior to the filing of the bankruptcy, the pre-bankruptcy general partners transferred their interest in the Debtors and their general partnership rights to R.J. Apartments, Inc., the post-bankruptcy general partner of the Debtors. While the evidence is inconsistent, it would appear the pre-bankruptcy transfer by the pre-bankruptcy general partners took effect post-petition to R.J. Apartments, Inc. There is testimony to support R.J. Apartments, Inc. taking possession prior to bankruptcy notwithstanding the pre-bankruptcy general partners signing the bankruptcy petition.

The transfer to R.J. Apartments, Inc. was without the knowledge of Glendale even though the mortgage documents re-

---

the language in Fla.Stat. § 697.07. Further, several bankruptcy courts and one state court of appeals have held the rent assignment is "absolute" upon compliance with the statute. *In re Aloma Square, Inc.,* 85 B.R. 623 (Bankr.M.D.Fla. 1988); *In re Mears,* 88 B.R. 419 (Bankr.S.D.Fla. 1988); *Executive Square, Ltd. v. Delray Executive Square, Ltd.,* 546 So.2d 434 (Fla. 4th DCA 1989). Notwithstanding this authority, this Court disagrees. Mortgage theory in Florida is based upon the lien theory. *City of Gainesville v. Charter Leasing Corp.,* 483 So.2d 465 (Fla. 1st DCA 1986). The creditor does not own an interest in property, i.e. rents. The Debtor does not own a mere possessory right. *Martyn v. First Fed. Savings and Loan Assn.,* 257 So.2d 576 (Fla. 4th DCA 1971), *compare with, Southtrust Bank of Alabama v. Thomas (In re Thomas),* 883 F.2d 991 (11th Cir.1989). The Debtor is fee owner and a creditor is limited to his remedies at law or equity, i.e. sue on the note or foreclose the lien. *Thomas v. Hartman,* 553 So.2d 1256 (Fla. 5th DCA 1989). To read the statute regarding assignments of rent as Glendale would wish would create a forfeiture within the lien context without a judicial foreclosure which is required by Florida law. *Carolina Portland Cement Corp. v. Baumgartner,* 99 Fla. 987, 128 So. 241 (1930); Fla.Stat. § 702.01. Fla.Stat. § 697.07 does nothing more than dispel the necessity of a mortgagee to seek a receiver to protect rents. Actually, the necessity for a receiver to collect rents is related to two aspects of mortgage law: a mortgagee had no right to possession of the property much less the right to collect rents; and rent assignments had historically been single clauses in mortgage documents. With the advent of separate assignment of rents instruments and their recordation, any perfection problem was actually eliminated. Thus, the statute codified that change, and allowed collection of rents without a receiver, thus being consistent with the Uniform Commercial Code mechanism. Fla.Stat. § 679.502; *See, In the Matter of Fajardo,* 89 B.R. 232 (Bankr.M.D.Fla.1988). Further, the provisions of Fla.Stat. § 679.07 give notice to a defaulting mortgagor, provided an additional basis for the appointment of a receiver and the distribution of rents to competing mortgagees with or without an assignment of rents as provided by the circuit court. *Id.* This language is consistent with rights to collect, not ownership.

Any reading of the statute to create an absolute transfer of all interest in rents not only goes against the mortgage lien theory, but eliminates any reorganization by a Chapter 11 debtor. It is this Court's position such an interpretation runs afoul of both mortgage law and bankruptcy policy. To adopt the position of cases such as *In re 163rd Street Mini Storage, Inc.,* 113 B.R. 87 (Bankr.S.D.Fla.1990) would allow a mortgagee under state law to utilize rents without the necessity of foreclosing its mortgage lien. *See, Brooks v. Adams,* 115 So.2d 578 (Fla. 2nd DCA 1959). The better view is *In re One Fourth Street North, Ltd.,* 103 B.R. 320 (Bankr.M.D.Fla. 1989). Such is consistent with Florida mortgage lien policy.

quired notification to Glendale of such a transfer. The limited partnership documents require approval of the change of general partners by the limited partners, however, no such approval had been obtained. In addition, although the post-bankruptcy general partner, R.J. Apartments, Inc., claimed to be a Florida corporation, the evidence during the final evidentiary hearing held over several months produced evidence R.J. Apartments, Inc. was not incorporated in Florida. Subsequent to the conclusion of the final evidentiary hearing, R.J. Apartments, Inc. did incorporate in Florida although the corporate documents were executed prior to the filing of the bankruptcy.

The parties have stipulated to the introduction of the mortgage and promissory notes and related documents associated with Glendale's mortgage. Further, documents relating to the limited partnership agreements as to each of the Debtors has also been admitted. The parties have agreed and have stipulated to an admission of Exhibit 1 which is the data sheet on each one of the properties as regards the loan date, loan amount, maturity date, interest rate, monthly payment amount, default date, delinquent taxes, and other similar information.

## PARTNERSHIP TRANSFER

In January of 1990, the pre-bankruptcy general partners of Debtors entered into a stipulated agreement with Glendale whereby, among other things, Glendale was authorized to obtain a final judgment of foreclosure as to each of the Debtors but would forebear from seeking such final judgment to allow the Debtors to secure a binding contract of sale prior to March 1, 1990. Debtors would maintain the fire and casualty insurance, operate the apartment complexes, handle the day-to-day operations and finances, but with the oversight of Glendale. As an additional consideration for Glendale entering into the stipulation and forebearing, the Debtors agreed that if a bankruptcy petition was filed, they would agree to lift the automatic stay pursuant to Section 362 of the Bankruptcy Code. Approximately thirty days later, the pre-bank-

ruptcy general partners entered into an agreement with R.J. Apartments, Inc. whereby the pre-bankruptcy general partners would transfer their right, title and interest in the Debtors to R.J. Apartments, Inc., "a Florida corporation."

The agreement between the pre-bankruptcy general partners and R.J. Apartments, Inc. provided for consideration of $150,000.00 as to the transfer of all general partners interest in all Debtors to be paid thirty-six months from the entry of the agreement at eight percent. Conflicting testimony by the pre-bankruptcy general partners suggests the $150,000.00 was going to be paid through the Chapter 11 Plan to limited partners who had made loans to the Debtors. There is nothing in the agreement to that effect. There was testimony by the pre-bankruptcy general partners the $150,000.00 would not be payable unless R.J. Apartments, Inc. retained control of the Debtors which was meant to be a Chapter 11 Plan being confirmed. This agreement not only acknowledges the existence of Glendale's foreclosure actions, but contemplates Chapter 11 bankruptcy. Lastly, the agreement provided for notification to and approval by the limited partners of the change of general partners of each Debtor. Evidence supports that the notice was not given in any proper fashion and if any notice was given there was no consent by the limited partners as required by the agreement or the limited partnership agreement.

As to the creation of R.J. Apartments, Inc., its corporate documents were signed February 27, 1990, the same date as the agreement between R.J. Apartments, Inc. and the pre-bankruptcy general partners. It was to be a Florida corporation. Evidence established it was created for the sole purpose of taking over the operation of the Debtors and placing each Debtor into bankruptcy. Such was contemplated from the execution date of the agreement and was consummated by the filing of the petition one day after the agreement between the pre-bankruptcy general partners and R.J. Apartments, Inc. and the creation of R.J. Apartments, Inc. R.J. Apartments,

Inc. was not incorporated with the Secretary of the State of Florida until July 9, 1990 after Glendale, at the final evidentiary hearing, produced evidence establishing R.J. Apartments, Inc. was not incorporated in Florida and subsequent to this Court's order requiring proof of incorporation at the conclusion of the final evidentiary hearing. R.J. Apartments, Inc. knew of the joint stipulation between the Debtors through their pre-bankruptcy general partners and Glendale.

## THE PROPERTIES

Growers Properties No. 56 owns Continental Villas. The outstanding principal balance of the Glendale mortgage is 1.5 million dollars with a default date of September 15, 1989. Taxes are delinquent for 1988 and 1989 in the approximate amount of $120,000.00. Per diem interest runs from $439.00 to $643.00, depending on whether the contract interest rate or the default interest rate is being applied.

Growers Properties No. 80 is composed of two apartment complexes, The Mall and My Chateau. Outstanding principal on The Mall is $528,000.00 with a default date of October 1, 1989. Delinquent 1989 taxes are $25,000.00 with per diem interest of $159.00 to $231.00, depending on whether the contract interest rate or the default interest rate is being applied. My Chateau has a principal loan balance of $250,000.00 with a default date of October 1, 1989. Delinquent taxes for 1989 are $8,145.00. The per diem interest is between $75.00 and $109.00, depending on whether the contract interest rate or the default interest rate is being applied.

Growers Properties No. 86 owns the Patrician Apartments. The principal balance is $2,600,000.00 with a default date of August 15, 1989. Delinquent taxes for 1988 and 1989 are approximately $158,000.00. The per diem interest is between $746.00 and $1,100.00, depending on whether the contract interest rate or default interest rate is being applied.

Growers Properties No. 89 owns the Cascade Apartments which has an outstanding loan balance of $1,300,000.00 with a default date of September 1, 1989. The delinquent 1988 and 1989 taxes are approximately $71,000.00. The per diem interest is $382.00 to $565.00, depending on whether the contract interest rate or default interest rate is being applied.

The two pre-bankruptcy general partners testified to the pre-petition operations of the Debtors. They testified the properties had been for sale since 1988 and they had not been able to obtain refinancing of the Glendale mortgages nor obtain any contract to purchase the properties until the R.J. Apartments, Inc. agreement. Prior to the transfer to R.J. Apartments, Inc., they had gone to the limited partners three times to obtain additional funds to keep the apartments operating. They had obtained a total of $150,000.00 which was used to pay some of the ad valorem taxes and make repairs to several of the buildings. No capital improvements were made. The pre-bankruptcy general partners testified that in February, 1990 each one of the Debtors generated a loss. There were not sufficient monies to service the mortgage nor to pay expenses of the Debtors. Nonetheless, one of the general partners who operated as the managing agent of the Debtors took a five percent management fee of the gross receipts through December, 1989. The managing partner testified the properties needed $250,000.00 worth of maintenance at the time of the filing of the bankruptcy. During cross examination he admitted to testifying at his deposition that the Patrician Apartments (Growers Properties No. 86) needed $200,000.00 worth of maintenance by itself. It is clear that whatever repairs or maintenance accomplished by the pre-bankruptcy general partners was cosmetic at best.

## POST–PETITION PROPERTY OPERATIONS

■ Testimony established the present state of maintenance on the properties, the valuation of the properties, and their present income producing capabilities.

The testimony of experts plus photographs entered into evidence clearly show at the time of the filing of the bankruptcy,

substantial maintenance and repair was necessary for all Debtors. There were a number of units in each complex which were not rentable, many of the appliances in the apartments were inoperable and fixtures and appliances were very old and needed to be replaced. There were safety violations as to structure and electrical work. There was need for general repair, painting, and roof replacement. Also, at the time of the filing of the bankruptcy each unit generated a loss: Patrician Apartments—$21,000.00, Continental Villas—$14,200.00, Cascade Apartments—$5,000.00, The Mall—$3,000.00, and My Chateau—$366.00. Similarly, at the time of the filing of the bankruptcy, occupancy of these various apartments was low: Patrician Apartments—52% occupancy, Continental Villas—64% occupancy, Cascade Apartments—61% occupancy, The Mall—68% occupancy, and My Chateau—53% occupancy.

With the advent of the new management by R.J. Apartments, Inc., the apartment complexes had increased occupancy to at least 90% and with an increase in income sufficient to pay debt service. Conversely, while occupancy increased, only the non-rentable units were put back into service without further maintenance taking place. There was only $5,000.00 available from all Debtors after making debt service each month. R.J. Apartments, Inc., by its activity, clearly was able to reduce costs, advance occupancy, but not produce sufficient funds to stabilize the Debtors. Debtors, by their own evidence, established at least $300,000.00 would be necessary to rehabilitate the five apartment complexes. Evidence was also adduced as to the value of each one of the apartment complexes. Although such testimony was not related to relief from the stay under Section 362(d)(2), it was used by Glendale within its context of producing evidence of bad faith. Glendale's expert witnesses testified the Patrician Apartments (Growers Properties No. 86) had a market stabilized value of 3.6 million dollars against an as is value of 2.9 million dollars with a value under the income approach of 2.5 million dollars as against a debt due Glendale of 2.6 million dollars in principal, approximately $170,000.00 in interest through the date of filing, and $156,000.00 of delinquent taxes. As to the Cascade Apartments (Growers Properties No. 89), Glendale produced evidence of a market stabilized value of 1.6 million dollars and an income value of 1.8 million dollars against a principal mortgage balance of 1.3 million dollars with $81,000.00 of delinquent interest through the date of filing of the bankruptcy and $71,000.00 of delinquent taxes. As to The Mall (Growers Properties No. 80), testimony from Glendale's expert showed a market stabilized value of 1 million dollars and an income approach value of $960,000.00 as against an outstanding principal loan of $528,000.00, with $28,650.00 of delinquent interest through the date of the filing, and $25,000.00 of delinquent taxes. Also, as a part of Growers Properties No. 80, the evidence as to My Chateau suggested a market stabilized value of $515,000.00, but an income approach value of $250,000.00 against a loan balance of $249,000.00 with delinquent interest of $13,516.00 through the date of the filing. Delinquent taxes were $8,145.00. Lastly, as to the Continental Villas (Growers Properties No. 56), Glendale produced expert testimony the value of the property was 2.2 million dollars as to the market approach and 2 million dollars as to the income approach as against a 1.5 million dollars outstanding mortgage balance with $86,000.00 of interest due up to the date of the filing. Delinquent taxes are $124,000.00.

While this Court has some question as to the credibility of some of the factors used by Debtors' expert in coming to his valuations, there is no doubt the values produced by Debtors' expert are within acceptable ranges as testified by Glendale's experts. More importantly though is the fact the parties are dealing with stabilized values, that is, the value of properties would be at that amount assuming conditions were such (repairs, etc.) to produce such value within a certain period of time. Such stabilization would require bringing the property up to a certain physical standard and making all appropriate repairs in order to

operate at that level. The amount of time to stabilize value ranged from ninety days for My Chateau to ten months for the Cascade Apartments. The only way such repair and refurbishment and the stabilized value can be achieved is by using the cash collateral of the Debtors. This refurbishment would require negating any debt service (adequate protection) to Glendale juxtaposed against Glendale as a fully secured creditor entitled to its interest and attorneys fees and costs under Section 506 of the Bankruptcy Code. Even default interest may be appropriate. *Equitable Life Assurance Society v. Sublett (In re Sublett)*, 895 F.2d 1381 (11th Cir.1990).

The Court will grant the Motion to Dismiss for bad faith filing and will lift the stay for cause. The Debtors clearly have only one asset. They have few unsecured creditors, those creditors being utilities, attorneys with fees which are actually at $1,100.00 versus $11,000.00 as shown on the schedules, and limited partners who are insiders. The Debtors have few employees, those being maintenance people. The properties have been subject not only to a foreclosure action as the result of default, but the Debtors have entered into a stipulation as regards lifting of the automatic stay.[2] The Debtors' financial problems involve essentially a dispute between the mortgagee on the property and the Debtors, which was the subject of a state court action and a stipulation.

More importantly however, is the fact the transfer of the Debtors by the pre-bankruptcy general partners to a "corporation" was without notice to Glendale, and without notice to and approval by the limited partners. In addition, this transfer was clearly created for the sole purpose of filing bankruptcy and utilizing Chapter 11 to retain rents and profits that were properly assigned to Glendale to operate the Debtors during bankruptcy. The consideration for the transfer between the pre-bankruptcy general partners and R.J. Apartments, Inc. was illusory. It was nothing more than the pre-bankruptcy general partners seeking to obtain some form of protection and possible remuneration from their lost cause.[3] R.J. Apartments, Inc. was making a speculation in limited partnerships that may have equity only envisioned within the bankruptcy context and at the expense of Glendale. The Court finds R.J. Apartments, Inc. was created with the intent to abuse the judicial process through the utilization of reorganizing the Debtors under the Bankruptcy Code. As the Eleventh Circuit considered in *Phoenix Piccadilly, Ltd. v. Life Insurance Company of Virginia (In re Phoenix Piccadilly)*, 849 F.2d 1393 (11th Cir.1988), the factors which are in evidence show the petitions were filed to delay or frustrate legitimate efforts of the secured creditor to enforce its rights. The Court finds it does not matter there may be equity in the property and new post-petition management may cure many of the ills of pre-petition mismanagement. As long as the initial mechanism utilized (bad faith motivated the bankruptcy) is one which falls within the criteria created under *In re Phoenix Piccadilly, Ltd.* and its progeny,[4] then post-petition improvements to Debt-

**2.** Glendale cites to authority which stands for the proposition pre-petition stipulations regarding creditor's right to relief from the automatic stay in event debtor files for bankruptcy is enforceable in bankruptcy. *In re Citadel Properties, Inc.*, 86 B.R. 275 (Bankr.M.D.Fla.1988); *In the Matter of International Supply Corporation of Tampa, Inc.*, 72 B.R. 510 (Bankr.M.D.Fla. 1987); *In the Matter of Gulf Beach Development Corp.*, 48 B.R. 40 (Bankr.M.D.Fla.1985).

**3.** One of the pre-bankruptcy general partners, as president and sole shareholder of a real estate brokerage firm, obtained a commission for the transfer to R.J. Apartments, Inc. on the date of transfer. The commission was $50,000 in the form of a promissory note which reads in part

The parties acknowledge that R.J. Apartments, Inc., as successor general partner of the above-described partnerships, will be filing Chapter 11 bankruptcy proceedings on behalf of the partnerships. The commission due hereunder shall be paid sixty (60) days from the day on which R.J. Apartments has successfully reorganized the partnerships and all Chapter 11 proceedings are discharged. If reorganization is unsuccessful, there shall be no commission due.

**4.** *See also, Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670 (11th Cir.1984); *In re Victory Construction Co., Inc.*, 9 B.R. 549 (Bankr.C.D.Cal.1981).

ors' property are not relevant. *Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.)*, 825 F.2d 296 (11th Cir.1987). In this case, the Court is not impressed by the post-petition improvements in that they do not generate sufficient income to cure the refurbishment and repair needs of each of the Debtors. Further, such actions are tainted with the bad faith filing of the bankruptcy petitions in February of 1990.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Glendale Federal's Motions to Dismiss and for Relief from Automatic Stay are granted. The Chapter 11 case is dismissed for bad faith filing and the automatic stay is lifted as to each of the Debtors to allow Glendale to complete its foreclosure action.

DONE AND ORDERED.