**In the Matter of TAMPA BAY BRIAR-WOOD ASSOCIATES LTD., d/b/a Bay Pointe Apartments f/d/b/a Briarwood Apartments, Debtors.**

**Bankruptcy No. 89–6992–8B1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 21, 1990.

Russell M. Blain, Stichter & Riedel, P.A., Tampa, Fla., for debtors.

Judith A. English, Carlton Fields, Tampa, Fla., Tammy Cohen, David & Hagner, P.C., Washington, D.C., for Government Nat. Mortg. Ass'n.

## ORDER ON MOTION FOR RETURN OF RENTAL INCOME

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

THE MATTER under consideration is a Motion for Return of Rental Income filed

by Government National Mortgage Association (GNMA) against Tampa Bay Briarwood Associates Ltd., d/b/a Bay Pointe Apartments, p/d/b/a Briarwood Apartments (Debtor), its general partner, Equity Investment Associates–B (Equity), a Mississippi partnership, and Equity's general partners, Charles F. McReynolds, Ramon Landry and Frank Genzer. GNMA seeks an order requiring Debtor to return all rental income it used to pay its bankruptcy attorneys. The question before the Court is whether Debtor and its general partners should be required to return the rental income paid to its bankruptcy counsel.

## STATEMENT OF FACTS

The facts generally are undisputed by the parties. Debtor owns Bay Pointe Apartments (Project). In November 1986, Debtor borrowed money to refinance an existing mortgage on the property. In connection with the refinancing efforts, Debtor executed a note and mortgage in favor of DRG Funding Corp. (DRG), as well as entering into a Regulatory Agreement for Multi–Family Housing Project Co–Insured by HUD (Regulatory Agreement) and a collateral assignment of leases and rents. GNMA subsequently succeeded to the interests of DRG in all the loan documents associated with the refinancing. Debtor defaulted on the loan on June 1, 1988 by failing to make the monthly mortgage payment.

On October 2, 1989, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. Prior to the filing of the bankruptcy petition, Debtor paid legal fees to its bankruptcy attorneys in connection with the filing of the petition.

## STATEMENT OF ISSUES

GNMA contends Debtor violated the Regulatory Agreement by using rental income to pay its bankruptcy attorneys when the mortgage was in default. Debtor counters GNMA's allegation by claiming the Regulatory Agreement does not prevent Debtor from paying legal fees necessary for the operation of the Project and, alter-

natively, the fees paid to bankruptcy counsel were not entirely from the rental income of the Project.

## DISCUSSION

The relevant portion of the Regulatory Agreement provides in the event of default, the owner may use Project funds only for limited purposes, one of which is "to pay reasonable expenses necessary to the operation and maintenance of the Project." [1] GNMA asserts the funds paid to Debtor's bankruptcy counsel were not expenses necessary to the operation of the Project and the payment of these expenses by Debtor violates the Regulatory Agreement. GNMA's position is supported by case law involving the same type of regulatory agreement entered into by other debtors. *See, In re EES Lambert Associates,* 43 B.R. 689 (Bankr.N.D.Ill.1984), *aff'd,* 63 B.R. 174 (N.D.Ill.1986); *In re Hil'Crest Apartments,* 50 B.R. 610 (Bankr.N.D.Ill. 1985); *In re Michigan Beach Apartments,* 61 B.R. 446 (Bankr.N.D.Ill.1986); *In re Garden Manor Associates,* 70 B.R. 477 (Bankr.N.D.Cal.1987).

*Lambert* involved a limited partnership debtor. In connection with the financing of an apartment complex, the debtor signed a regulatory agreement for multi-family housing. Subsequently, the debtor defaulted on the note and mortgage and the Department of Housing and Urban Development (HUD) instituted foreclosure proceedings. Prior to the filing of the Chapter 11 petition, the debtor paid legal fees to a law firm for services associated with defending the foreclosure suit and for services in connection with the filing of the bankruptcy petition.

The court in *Lambert* held the legal fees paid in connection with the foreclosure action and the bankruptcy were not expenses necessary to the operation of the apartment complex. The court concurred with *Thompson v. United States,* 408 F.2d 1075 (8th Cir.1969) which explained the term operating expenses should be construed with some strictness and "should be limited to

---

1. Regulatory Agreement ¶ B.3.b.

expenses paid or incurred in connection with the *actual operation* of the project as a going concern." [2] (emphasis added). Both the *Lambert* and the *Thompson* courts observed the legal fees paid in those cases, rather than covering operating expenses, benefitted the investors by allowing them to continue to be in a position to operate the respective projects. An additional factor was the waiver of personal liability on the mortgage afforded to the investor through this HUD-insured program.[3] To allow the use of project funds to benefit the investor would be contrary to the purpose of a program whose primary beneficiaries are individuals who live in low-income housing.[4] The *Lambert* court provided examples of when legal fees could be construed to be in connection with the *actual operation* of the project. Such examples were legal fees incurred to collect rents or evict tenants. *Lambert* at 691.

Debtor did not provide any case authority contrary to the cases provided by GNMA. Instead, Debtor distinguishes those cases from the facts of the instant case. Debtor contends the authority presented by GNMA should not be given any weight by this Court because in those cases it was assumed the mortgagees were given an absolute assignment of rents as opposed to cash collateral in the rents as in the instant case.[5] Debtor argues the absolute assignment of rents gave the mortgagees in those cases an enhanced position to that of a mortgagee with a mere secured interest in cash collateral such as GNMA

has in the instant case. The Court does not read the cases as having made the assumption Debtor suggests.[6] In fact, *Lambert* stated the income from the operation of the project was cash collateral. *Lambert* at 692.

■■■ Debtor supports its position by analogizing the language in Section 503(b)(1)(A) of the Bankruptcy Code with the language in the Regulatory Agreement. Section 503(b)(1)(A) provides that actual, necessary costs, and expenses of preserving the bankruptcy estate are administrative expenses.[7] Under this definition, attorneys fees incurred in connection with the filing of the bankruptcy petition would be classified as administrative expenses. The Court does not agree the determination of bankruptcy attorney fees necessary to preserve the estate under Section 503(b)(1)(A) has any relation to those fees being necessary expenses to the daily operation of the Project. Expenses necessary to the preservation of the bankruptcy estate may or may not be expenses necessary to the actual operation of the Project. The similarity in the language of the Regulatory Agreement and Section 503(b)(1)(A) does not persuade this Court the fees of bankruptcy attorneys, albeit administrative expenses, are expenses necessary to the operation of the Project.

Debtor further argues the attorneys fees incurred in connection with the filing of the bankruptcy petition are for the benefit of

---

**2.** In *Thompson,* the legal fees in question were not incurred for the defending of a foreclosure action or filing of a bankruptcy petition, rather the legal fees were incurred for the original acquisition of the project, settlement of lien claims, and closing of the construction loan.

**3.** The Regulatory Agreement sets out as consideration for HUD's endorsement for the mortgage insurance, the owners must comply with the terms of the Regulatory Agreement. By virtue of the HUD endorsement, liability on the note is nonrecourse as to the owners.

**4.** The policy behind the HUD insured program in simplified terms is that funds from the project are to be used to protect the habitability of low income tenants, not the investments of the investors.

**5.** On February 16, 1990, an order was entered on Debtor's Motion For Authority to Use Cash Collateral and GNMA's Motion to Prohibit Use of Rental Income and/or Cash Collateral which reflected this Court's finding that GNMA did not own the rental income by virtue of absolute assignment, however, GNMA did have a perfected security interest in the rents and therefore the rents constituted cash collateral. *See generally, In re Growers Properties,* 117 B.R. 1015 (Bankr.M.D.Fla.1990) at Footnote 1.

**6.** If there was an absolute assignment of rents, then GNMA would control the operating income and most assuredly not compensate Debtor's counsel.

**7.** Administrative expenses receive priority status in distribution under Section 507(a)(1).

all creditors and not just the investors, as GNMA proposes. GNMA, as primary creditor in this case, received no benefit from the payment of bankruptcy attorneys fees.[8] In fact, GNMA's secured claim would be paid after attorneys fees pursuant to the distribution scheme under Section 507(a).

The Court agrees with the characterization of the types of expenses allowed by the Regulatory Agreement as espoused by both *Thompson* and *Lambert* (i.e., expenses for *actual operation*). It is this Court's finding the attorneys fees incurred for services rendered in connection with the bankruptcy were not expenses necessary to the actual operation of the Project. Further, the Court finds the attorneys fees which were paid to bankruptcy counsel from income of the Project violate the Regulatory Agreement. Conversely, the Court does not find counsel should bear the burden of funding the bankruptcy for the investors, therefore, any allowable attorneys fees are deemed administrative expenses and shall be paid as a condition of confirmation from funds other than those generated from the operation of Debtor.

This Court previously ordered Debtor to file an Amended Disclosure Statement to disclose the amount and the source of funds used to pay the bankruptcy attorneys fees. In light of this previous order, the Court will determine the amount and source of funds used to pay these fees upon the filing of the Amended Disclosure Statement.

Accordingly it is,

ORDERED, ADJUDGED AND DECREED that any fees paid to counsel for services rendered in connection with the bankruptcy are not expenses necessary to the operations of the Project and the payment of such fees with funds derived from operations of the Project violates the Regulatory Agreement. It is further

ORDERED, ADJUDGED, AND DECREED the amount and source of funds used by Debtor to pay its bankruptcy attorneys will be determined by the Court upon the filing of the Amended Disclosure Statement. It is further

ORDERED, ADJUDGED AND DECREED the amount the Court determines to have been paid to bankruptcy counsel from funds derived from the operations of the Project shall be reimbursed to the estate by the general partners of Debtor as a condition of confirmation.

DONE AND ORDERED.

---

**8.** Debtor submits the benefit is that without the filing of the bankruptcy, claims against Debtor would have multiplied which would have resulted in the piecemeal dissolution of the Project, thereby causing the value of the apartment complex as a going concern to diminish.