125 F.3d 771
 97 Cal. Daily Op. Serv. 7267, 97 Daily Journal
D.A.R. 11,743
ARIZONA ODDFELLOW-REBEKAH HOUSING INC., an Arizona
corporation, Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
an Agency of the United States Government; Henry Cisneros,
in his Official Capacity as Secretary of the United States
Department of Housing and Urban Development, Defendants-Appellees.
 No. 96-16263.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 14, 1997.
Decided Sept. 10, 1997.
 
 Gregory E. Hinkel, Phoenix, Arizona, for plaintiff-appellant.
 Janet Napolitano, United States Attorney, James C. Hair, Jr., Assistant United States Attorney, Phoenix, Arizona, for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; Earl H. Carroll, District Judge, Presiding. D.C. No. CV 93-1627 EHC.
 Before: FARRIS, TASHIMA, Circuit Judges, and STAGG, Senior District Judge.*
 TASHIMA, Circuit Judge:
 
 
 1
 This case presents an important question regarding the interpretation of language routinely used in regulatory agreements between defendant-appellee United States Department of Housing and Urban Development ("HUD") and owners of low income housing projects. HUD insures plaintiff-appellant Arizona Oddfellow-Rebekah Housing's ("Arizona Oddfellow") mortgage on a low-income housing project. As a condition of such mortgage insurance, Arizona Oddfellow must abide by a Regulatory Agreement which prohibits it from spending project revenues for anything other than "reasonable operating expenses." We must determine whether attorneys' fees incurred in defending against housing and employment discrimination suits constitute reasonable operating expenses. We conclude that they do.
 
 I. BACKGROUND
 
 2
 Arizona Oddfellow owns and operates a low income housing project for the elderly. The mortgage for the housing project is insured by HUD under § 236 of the National Housing Act, 12 U.S.C. § 1715z-1. As a condition of its participation in the § 236 program, Arizona Oddfellow entered into a Regulatory Agreement and Addendum with HUD. That agreement requires Arizona Oddfellow to place all revenues in a project fund and permits it to use project funds only for limited purposes, including expenses "necessary" or "incident" to project operation. Further, the Regulatory Agreement requires Arizona Oddfellow to receive permission before using project funds for any purpose, except "reasonable operating expenses" and necessary repairs:
 
 
 3
 Owners shall not without prior written approval of the Commissioner
 
 
 4
 ...
 
 
 5
 (b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds, except for reasonable operating expenses and necessary repairs....
 
 
 6
 Between 1989 and 1992, Arizona Oddfellow used project funds to pay attorneys' fees for the defense of several discrimination actions, including eight administrative complaints, a suit filed in Arizona state court, and two suits filed in federal district court alleging a pattern-or-practice of racial discrimination. Four of the administrative complaints were filed with the Arizona Attorney General. Those matters were concluded with the issuance of "no cause" orders. Attorney's fees of $7,236 were paid out of project funds for these proceedings. The remaining four administrative complaints were filed with HUD. Arizona Oddfellow denied the allegations in these matters and no further action has been taken-they have never been adjudicated. $1,366.00 in project funds have been paid for attorney's fees in these matters. The Arizona state court granted summary judgment in favor of Arizona Oddfellow. Attorney's fees expended defending this action, from project funds, totalled $21,268.25.
 
 
 7
 The two federal suits were consolidated and the parties eventually agreed to a consent decree enjoining Arizona Oddfellow from engaging in racial discrimination, requiring certain affirmative action, and providing that Arizona Oddfellow would pay one plaintiff $30,000. In reaching that settlement, Arizona Oddfellow did not admit liability or any wrongdoing on its part. Attorney's fees in these two actions, paid from project funds, totalled $59,309.00. HUD demanded that the project funds be reimbursed a total of $91,553.65 for all of these fees.[1]
 
 
 8
 HUD never authorized Arizona Oddfellow to use project funds to defend the discrimination actions. In HUD's opinion, none of the attorneys' fees constituted reasonable operating expenses. Arizona Oddfellow refused HUD's reimbursement demand and filed this declaratory judgement action. Both parties moved for summary judgment. The district court granted in part and denied in part Arizona Oddfellow's motion for summary judgment, holding that the expenses incurred by Arizona Oddfellow in the federal actions-the pattern-or-practice discrimination suits-were neither "operating expenses" nor "reasonable." It ordered Arizona Oddfellow to return $79,449.81 to the project's funds.[2]
 
 
 9
 Arizona Oddfellow timely appeals.[3] We have jurisdiction under 28 U.S.C. § 1291,[4] and we reverse. We review the district court's grant of summary judgment de novo. King v. AC & R Advertising, 65 F.3d 764, 767 (9th Cir.1995).
 
 II. DISCUSSION
 
 10
 The district court concluded that the fees incurred by Arizona Oddfellow in defending the pattern-or-practice discrimination suits were not "reasonable operating expenses." It suggested both that they were not "operating expenses," apparently because the discrimination suits alleged a pattern-or-practice of discrimination, and that they were not "reasonable," apparently because Arizona Oddfellow did not "prevail" in the litigation. We reject both propositions and conclude that Arizona Oddfellow's litigation expenses were "reasonable operating expenses," as that term is used in the Regulatory Agreement.
 
 
 11
 A. Are Legal Expenses "Operating Expenses"?
 
 
 12
 This circuit has not yet considered what expenses or expenditures constitute "operating expenses" under the HUD Regulatory Agreement and no court has yet considered whether fees incurred in defending discrimination suits arising from the day-to-day operation of a project constitute "operating expenses." There is, however, persuasive authority that legal expenses incurred in suits arising from day-to-day operations are operating expenses. Extending this principle to expenses incurred in discrimination suits arising from day-to-day operations, we conclude that the attorneys' fees Arizona Oddfellow incurred in the pattern-or-practice suits were "operating expenses."
 
 
 13
 The few cases that have addressed the meaning of "operating expenses," as used in the HUD Regulatory Agreement, have all agreed on a central principle: to be operating expenses, expenses must primarily "benefit the project," rather than the owner. This distinction was first articulated in United States v. Thompson, 272 F.Supp. 774 (E.D.Ark.1967), aff'd, 408 F.2d 1075 (8th Cir.1969). Thompson reasoned that "operating expenses" is "a term which probably has no fixed ... meaning," but must be construed "with at least reasonable strictness" and "should be limited to ... the actual operation" of the project. Id. at 787. Guided by these criteria, Thompson held that expenses are "operating expenses" only if their primary benefit is to the project, rather than the owner. Id. Numerous courts have adopted this principle. See, e.g., United States v. Frank, 587 F.2d 924, 927 (8th Cir.1978); United States v. Berk & Berk, 767 F.Supp. 593, 598 (D.N.J.1991); In re RLA of Madison, Inc., 177 B.R. 78, 80 (Bankr.M.D.Tenn.1994); In the Matter of Tampa Bay Briarwood Assocs. Ltd., 118 B.R. 126, 128 (Bankr.M.D.Fla.1990); In re Garden Manor Assocs., 70 B.R. 477, 482 (Bankr.N.D.Cal.1987); In the Matter of EES Lambert Assocs., 63 B.R. 174, 175 (Bankr.N.D.Ill.1986).
 
 
 14
 With respect to attorneys' fees, it is widely accepted that they are operating expenses, if they are incurred in legal actions that benefit the project. Frank, 587 F.2d at 927; Berk & Berk, 767 F.Supp. at 598; Thompson, 272 F.Supp. at 787; Madison, 177 B.R. at 80; Briarwood, 118 B.R. at 128; Garden Manor, 70 B.R. at 482; Lambert, 63 B.R. at 175; In re Michigan Beach Apartments, 61 B.R. 446, 450 (Bankr.N.D.Ill.1986); In re Hil'Crest Apartments, 50 B.R. 610, 612 (Bankr.N.D.Ill.1985); In re EES Lambert Assocs., 43 B.R. 689, 690-91 (Bankr.N.D.Ill.1984).
 
 
 15
 Whether a legal action "benefits the project," however, has been considered in only a narrow range of legal actions. Most of those cases have involved legal actions to create or preserve the owner's ownership interest and have held that those actions "benefit the owner," not the project. They include actions facilitating acquisition of the project, Thompson, 272 F.Supp. at 789, construction of the project, id., and to protect the owner's interest in bankruptcy or foreclosure proceedings. See, e.g., Frank, 587 F.2d at 927; Berk & Berk, 767 F.Supp. at 598; Madison, 177 B.R. at 80; Briarwood, 118 B.R. at 129; Garden Manor, 70 B.R. at 482; Lambert, 63 B.R. at 175; Michigan Beach, 61 B.R. at 450; Hil'Crest, 50 B.R. at 612; Lambert, 43 B.R. at 691.
 
 
 16
 None of these cases required the court to determine whether a suit arising from a project's day-to-day operations benefitted the project, but language found in nearly every legal expense case suggests that such suits do indeed "benefit the project." As these cases have put it, "legal expenses may be ... necessary to the operation of the project ... if they are expended to collect rent, evict tenants, or defend lawsuits 'growing out of the operation of the project.' " Berk & Berk, 767 F.Supp. at 598 (quoting United States v. Mansion House Center North Redev. Co., 419 F.Supp. 85, 87 (E.D.Mo.1976)); see also Frank, 587 F.2d at 927; Briarwood, 118 B.R. at 128; Garden Manor, 70 B.R. at 481; Hil'Crest, 50 B.R. at 612; Lambert, 43 B.R. at 691.
 
 
 17
 Thus, the conclusion that flows from these cases is that legal expenses incurred in suits arising out of the project's day-to-day business do "benefit the project" and should be considered "operating expenses." Unlike the legal expenses at issue in the acquisition, foreclosure and bankruptcy cases, the legal expenses incurred in suits arising out of the project's day-to-day business will generally not advance the owner's individual interests. Rather, like the expenses incurred in the oft-cited rent-collection and eviction examples, they will advance the project's interests by assuring that the project may perform the operations necessary to maintain its business. Thus, they benefit the project and are properly considered "operating expenses."
 
 
 18
 Under this analysis, expenses incurred in discrimination cases arising out of the day-to-day operation of a project-such as those at issue in this case-are to the benefit of the project and are therefore operating expenses. Such expenses do not benefit the owner, for they do not serve to advance or protect his ownership interests. They do, however, benefit the project in so far as they protect project resources and help preserve the project's discretion in hiring and rentals.[5] Like expenses incurred in actions to collect rent or evict tenants, expenses incurred in defense of discrimination suits arising from day-to-day business are the unavoidable costs of running a project,[6] and are therefore "operating expenses."
 
 
 19
 In reaching a contrary result, the district court found it significant that the discrimination suits involved here were "pattern-or-practice" suits. It reasoned that such suits are directed at management in a way that other discrimination actions are not, such that defense of such suits must be for the benefit of the owner, not the project. As the district court put it, they "put in issue plaintiff's management," and "the simple fact is that the defense of the two cases was necessary for the owners or investors in Fellowship Towers to protect their investment from default and foreclosure. The primary beneficiaries of these fees were the owners or investors."
 
 
 20
 We do not find this reasoning convincing. It is true that pattern-or-practice cases may call into question managerial policy as well as individual acts, and that an adverse judgment in a pattern-or-practice case might well be a more serious indictment of management (and thus, perhaps, the owner). Even so, pattern-or-practice cases do not implicate the owner's ownership interests any more than other discrimination suits. There is nothing in the record to suggest that if Arizona Oddfellow had lost the pattern-or-practice case it would have forfeited its ownership interest, or suffered a default or foreclosure. The district court's finding that "the defense of [the pattern-or-practice cases] was necessary to ... protect their investment from default and foreclosure" finds no support in the record.
 
 
 21
 In sum, legal expenses incurred in defending discrimination suits arising from day-to-day operations are operating expenses because they benefit the project, not the owner, and this is true even when the discrimination suit alleges a pattern-or-practice of discrimination. Thus, they constitute operating expenses within the meaning of the Regulatory Agreement.
 
 
 22
 B. Were the Legal Expenses "Reasonable"?
 
 
 23
 The district court also concluded that even if Arizona Oddfellow's attorneys' fees were operating expenses, they were not "reasonable" operating expenses because Arizona Oddfellow did not "prevail" in the discrimination litigation. As the court put it, Arizona Oddfellow's "legal fees [were] not 'reasonable' operating expenses ... [because] [Arizona Oddfellow] was not the prevailing party ..." Again, we disagree.
 
 
 24
 We observe at the outset that there is no caselaw construing the term "reasonable" in the HUD Regulatory Agreement. None of the cases that have described litigation expenses as operating expenses has suggested that these expenses are only reasonable if the project prevails in the suit. Indeed, using this approach would have several undesirable effects. For example, it would require projects to plan and undertake their defenses "in total ignorance of the factor ... critical" to determining who would pay for the defense-"the final outcome of the case." Mountain States Tel. & Tel. Co., 939 F.2d at 1034 (criticizing prevailing party test used to determine whether a utility's operating expenses were reasonable). Such uncertainty would increase the risk inherent in putting on a legitimate defense and thus place § 236 projects at a disadvantage in litigation. We see nothing in the HUD Regulatory Agreement that suggests that this is an appropriate result.
 
 
 25
 Further, the prevailing party test would have undesirable effects with respect to settlement. In cases like this one, the "prevailing party" approach would require the district court to categorize a settlement as a "win" or a "loss" for the project. This, in turn, would require the district court to invest settlement terms with significance the parties did not intend and to speculate about the strength of each party's position in the underlying litigation without the benefit of a verdict or a fully-developed record in a litigated suit. Further, it would encourage the parties to litigate the "meaning" of the terms of their settlement, thus undermining the litigation-avoidance function of settlement. Indeed, in many cases, a mini-trial on the merits of the underlying litigation would be required. Finally, adoption of this approach will deter settlements. Because parties would be aware that their settlements could be construed as "losses" in subsequent litigation about whether litigation expenses were "reasonable," they would likely discount the amount they were willing to pay in settlement by the risk that the settlement would lead to losses in future cases, thus leading to both fewer and less valuable settlements. Again, we see nothing in the HUD Regulatory Agreement that suggests these are appropriate or intended results.
 
 
 26
 We think there is a more natural reading of the term "reasonable" in this context. In our view, "reasonable" is a broad and inherently amorphous term, not susceptible to precise definition. It is therefore telling that the Regulatory Agreement uses the term "reasonable," rather than narrower or more precise language, to limit the set of permissible operating expenses. To us, this suggests a "hands off" approach, an intent to allow project owners to engage in a wide range of normal project operations without fear of violating the Regulatory Agreement. Therefore, while operating expenses that are extraordinary in amount or character may be "unreasonable," we conclude that operating expenses that are typically or predictably incurred in the course of operating a project and are within normal limits as to amount are "reasonable" for the purposes of the HUD Regulatory Agreement.[7]
 
 
 27
 Interpreting "reasonable operating expense" in this fashion, we cannot conclude that expenses incurred in defending discrimination suits arising from a project's day-to-day operations are "unreasonable" merely because the project does not litigate the action to a contested judgment in which it is the prevailing party. There is nothing extraordinary about a project defending a discrimination suit and the expenses incurred in such a suit are both typical and predictable in the project context. Nor does the fact that a project loses a suit transform that suit from an ordinary one into an extraordinary one. Cf. Commissioner v. Tellier, 383 U.S. 687, 689-90, 86 S.Ct. 1118, 1119-20, 16 L.Ed.2d 185 (1966) (holding that expenses incurred in failed defense of criminal prosecution arising out of securities business were "ordinary and necessary" expenses under the Internal Revenue Code); Commissioner v. Heininger, 320 U.S. 467, 472, 64 S.Ct. 249, 253, 88 L.Ed. 171 (1943) (holding that expenses incurred in failed defense of suit charging dentist with fraudulent advertising were ordinary and necessary expenses under the Internal Revenue Code).
 
 
 28
 We conclude that the district court erred when it held that Arizona Oddfellow's attorneys' fees were not reasonable. There is nothing extraordinary about Arizona Oddfellow's defense or settlement of the discrimination suits at issue, and the costs incurred in defending those suits are not rendered "unreasonable" merely because Arizona Oddfellow did not, in the district court's view, prevail in the negotiated settlement.[8]
 
 III. CONCLUSION
 
 29
 The expenses incurred by Arizona Oddfellow in defending the pattern-or-practice discrimination suits were "reasonable operating expenses" under the Regulatory Agreement. We reverse and remand to the district court for proceedings not inconsistent with this opinion.[9]
 
 
 30
 REVERSED and REMANDED.
 
 
 
 *
 The Honorable Tom Stagg, Senior United States District Judge for the Western District of Louisiana, sitting by designation
 
 
 [1]
 The $91,553.65 total includes fees expended for this action, as well as a small amount of miscellaneous fees
 
 
 [2]
 The $79,449.81 includes a pro rata share of fees in this action, as well as the fees expended in the pattern-or-practice actions
 
 
 [3]
 HUD does not contest the district court's finding that the fees in the other actions were reasonable operating expenses, stating that it agrees with the district court with respect to some fees and that it declines to appeal others because the amount at issue is, in HUD's estimation, "insubstantial."
 
 
 [4]
 The district court had federal question jurisdiction under 28 U.S.C. § 1331. See Clay Tower Apartments v. Kemp, 978 F.2d 478, 480 (9th Cir.1992) (citing Saavedra v. Donovan, 700 F.2d 496, 498 (9th Cir.1983)) (interpretation of government contracts is governed by federal common law)
 
 
 [5]
 At the point in time when an action is filed against the project, the management is unlikely to know whether or not it has any merit
 
 
 [6]
 "We agree that 'lawsuits are a recurring fact of life in operating a business'...." Mountain States Tel. & Tel. Co. v. FCC, 939 F.2d 1021, 1034 (D.C.Cir.1991) (footnote omitted)
 
 
 [7]
 This analysis is supported by analogy to similar broadly-worded statutory schemes. For example, under the Medicare Act, the basic definition of "reasonable costs" is broad and inclusive. "The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A)
 The concept of "ordinary and necessary expenses" under the Internal Revenue Code is similarly broad and inclusive. See Internal Revenue Code § 162, 26 U.S.C. § 162(a). That broad and amorphous term has been interpreted to encompasses expenses that are "customary or usual" and "appropriate and helpful" in a given context. See Jacob Mertens, Jr., Mertens Law of Federal Income Taxation § 25.12.
 We believe that a similar interpretation is appropriate here.
 
 
 [8]
 In reaching this conclusion we do not approve any discrimination on the part of Arizona Oddfellow. We note that Arizona Oddfellow has been and remains subject to state and federal antidiscrimination laws. We further note that the Regulatory Agreement prohibits Arizona Oddfellow from engaging in discrimination and provides for severe penalties for its violation. Regulatory Agreement pp 11, 12. The Regulatory Agreement was entered into in 1970 and HUD has had the project under its active supervision for many years without ever having challenged the project's rental practices
 
 
 [9]
 The district court also determined that Arizona Oddfellow should reimburse the project for certain fees incurred in this action. Given our conclusion that the questioned expenses were reasonable operating expenses, it follows that Arizona Oddfellow is not required to reimburse the project for expenses incurred in this action